# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 24-CR-20177-MFL-DRG |
| | ) | |
| ALI KASSEM KAIN, | ) | Judge Matthew F. Leitman |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## **UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................1

II.    FACTUAL AND PROCEDURAL HISTORY ................................2

  A.    GSS and Defendant's Settlement Regarding His Association to Hezbollah's Money Laundering Scheme ........................................................2

  B.    Kain Started Operating Under a New Business Name, SOS, Which Was Investigated by Canadian and U.S. Agencies for Customs Violations ..........6

  C.    Defendant's False Payroll, Business, and Personal Income Tax Returns, and the October 2021 Search Warrant of SOS and Defendant's Residence ..........9

  D.    Indictment, Restitution Negotiations, and Plea ............................................11

III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553 ...............13

  A.    3553(a)(4), the Sentencing Guidelines: Defendant's Conduct Falls Within a Range of 18 to 24 Months of Incarceration. ................................................14

  B.    3553(a)(1), the Nature and Circumstances of the Offenses ..........................16

    1. 26 U.S.C. § 7202: Kain deceived his tax preparer by not disclosing his internal payroll database, paying cash wages, and he was complicit in Covid-related unemployment fraud. ........................................................17

    2. 26 U.S.C. § 7206(1): Defendant deceived the IRS and his tax preparer by failing to disclose his double-set of books and significant cash and overseas income ......................................................................................19

  C.    3553(a)(1), the History and Characteristics of the Defendant .....................24

    1. Kain lived an international, lavish, and cash-fueled lifestyle ...................25

    2. Kain past lies to financial institutions and numerous prior contacts with the legal system weigh in favor of a custodial sentence. ....................................32

  D.    3553(a)(2), General Deterrence ....................................................................35

  E.    3553(a)(2), Specific Deterrence: Kain's Continued Lies to the Court and Minimization of His Conduct Demonstrate a Need for Specific Deterrence 38

  F.    3553(a)(6), the Need to Avoid Unwarranted Sentence Disparities ..............39

IV.    RESTITUTION ...........................................................................42

  A.    The Parties Stipulated to an Employment Tax Loss of $125,738. ................43

B.  Defendant Owes $1,193,501 in Restitution for His Failure to Report Income from SOS ................................................................................................45

C.  Defendant Failed to Meet His Burden of Establishing Further Expenses That Would Reduce His Tax Liability....................................................................49

IV.  CONCLUSION..............................................................................................53

## I.     INTRODUCTION

From at least 2017 to 2020, Ali Kassem Kain ("Defendant") systematically underreported wages and failed to pay payroll taxes to employees, in violation of 26 U.S.C. § 7202, and failed to report millions of dollars in business income, in violation of *id.* § 7206(1).  Both of the crimes followed the same tact—Kain kept one set of records internally to log employee hours and track business income, but gave a completely different set of records to his accountants that underreported wages and income.  Before this Court, Kain has not fully accepted responsibility— in an August 7, 2025, email submission to the Court, he remarkably blames his failure to pay payroll taxes on his employees and tries to paint himself as a "struggling" businessman barely scraping by.  The reality is much more troubling. Kain has a history of contact with law enforcement, including reaching a settlement in a Hezbollah money laundering complaint and has likely committed customs violations while running his business.  Moreover, he was complicit in Covid-related unemployment fraud committed by his employees.  Far from struggling, Kain lived a lavish, cash-fueled, and international lifestyle.  He also lied to this Court by failing to disclose international assets and the true nature of his income.  For these reasons, many of the sentencing factors weight heavily in favor of a custodial sentence.  The Government therefore requests that Defendant be sentenced to 18 months incarceration.

Part and parcel with his failure to take responsibility, Defendant contests the

Government restitution calculation.  The Court however can decide this issue

without a hearing because Defendant does not contest the government's gross

receipts calculation, and Defendant has not provided any evidence to bear *his*

burden of proving additional offsetting expenses.  The government respectfully

requests that Defendant be ordered to pay $1,319,229 in restitution to the IRS.

## II.     FACTUAL AND PROCEDURAL HISTORY

Kain is a naturalized United States citizen born November 20, 1964, in

Lebanon.  PSR 3.  He has a Bachelor's and Master's degree in Engineering, and

has no known serious health issues.  *Id.*  Kain is married to Mariam Beydoun, also

an employee of SOS, with whom he filed joint Individual United States Income

Tax Returns, Forms 1040.  Kain also has significant ties to Lebanon—all but one

of Kain's seven siblings live there.  PSR 13-14 ¶38.

### A.     GSS and Defendant's Settlement Regarding His Association to Hezbollah's Money Laundering Scheme

Beginning in or about 2006, Defendant owned and operated a freight-

forwarding business located in Detroit, Michigan.  From 2006 to 2012, the

business's name was Global Shipping Services ("GSS"), after which it changed to

Specialized Overseas Shipping ("SOS").  GSS and SOS were in the business of

shipping automobiles from the United States to West Africa for customers.  Many

2

of the automobiles Defendant shipped were trucked to Michigan from Canada by third-parties, after which Defendant arranged for the vehicles to be shipped abroad.

In December 2011, a civil forfeiture complaint was filed by the United States in the Southern District of New York against, among others, GSS.  *See* Ex. 3, Compl., *United States v. Lebanese Canadian Bank SAL*, 11-cv-9186-PAE (S.D.N.Y. Dec. 15, 2011).  The forfeiture action and civil money laundering complaint arose out of an investigation conducted by the Drug Enforcement Administration and other federal law enforcement agencies into a scheme to launder money through the United States financial system and the United States used car market.  As part of the scheme, funds were allegedly transferred from Lebanon to the United States in order to purchase used cars, which were then shipped to West Africa and sold for cash.  Cash proceeds of those car sales were then transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon.  The cash was often moved through bulk cash smuggling networks. Members of the foreign terrorist organization Hezbollah and its supporters were allegedly involved at various points in the money laundering scheme.

For background on Kain's association to this scheme, on January 26, 2011, OFAC designated Ayman Joumaa, a Lebanese narcotics trafficker and money launder, under the Kingpin Act and associated regulations.  *See* 76 Fed. Reg. 5858 (Feb. 2, 2011).  The same day, OFAC designated the Hassan Ayash Exchange

Company, the Ellissa Exchange Company, and Ali Kharroubi for their role in

Joumaa's laundering of narcotics proceeds.  According to the U.S. Department of

Treasury, Joumaa and his network "coordinated the transportation, distribution,

and sale of multi-ton shipments of cocaine from South America and [have]

laundered the proceeds from the sale of cocaine in Europe and the Middle East. . . .

Operating in Lebanon, West Africa, Panama and Colombia, Joumaa and his

organization laundered proceeds from their illicit activities – as much as $200

million per month – through various channels, including bulk cash smuggling

operations and Lebanese exchange houses."  U.S. Dep't of Treasury, *Treasury*

*Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network*

(Jan. 26, 2011), *available at* https://home.treasury.gov/news/press-releases/tg1035

(last visited Aug. 7, 2025).  On November 23, 2011, Joumaa was indicted in the

Eastern District of Virginia for coordinating the shipment of over 85,000 kilograms

of cocaine and laundering in excess of $250 million in narcotics proceeds.  *United*

*States v. Ayman Joumaa*, Case No. 1:11-cr-00560 (E.D. Va. Nov. 23, 2011).  He

remains a fugitive.

On December 15, 2011, the United States filed a civil forfeiture complaint in

the Southern District of New York against, among others, the Ellissa Holding

Company, the Hassan Ayash Exchange Company, and all assets of the Ellissa

Holding Company and the Hassan Ayash Exchange Company that were held by

thirty used car buyers in the United States.  *See* Ex. 3.  Listed among the thirty

used car buyers holding assets of the Ellissa Holding Company and the Hassan

Ayash Exchange Company was Kain's former company, GSS.

In 2012, Kain reached a civil settlement with the U.S. Attorney's Office for

the Southern District of New York.  According to the Stipulation and Order of

Settlement filed with the Court on May 16, 2012, Kain acknowledged that he had

"been made aware of the allegations of a scheme to launder the proceeds of

violations of IEEPA and proceeds of narcotics transactions through the United

States used car market as set forth in the Complaint, including through the

purchase of used cars in the United States, their subsequent shipment to West

Africa, their sale, the commingling of the proceeds of those sales with narcotics

proceeds, and transportation of those funds into Lebanon; and allegations that

Hizballah members and supporters are involved at various points in the money

laundering scheme."  Ex. 6, Settlement, *United States v. Lebanese Canadian Bank

SAL*, 11-cv-9186-PAE, 3-4 (S.D.N.Y. May 16, 2012).  As a result of the civil

settlement, Kain was ordered to forfeit "all funds on deposit in the Comerica Bank

Accounts, held in the name of Global Shipping Services."  *Id.* at 4.  Additionally,

Kain was ordered that he "shall not enter into any transactions with any party who

he has reason to believe is affiliated with Hizballah."  *Id.* at 10 (Exhibit A, at 2).

Importantly, Kain was required to "properly file IRS Form 8300s and any other required cash reporting documents." *Id.* at 9 (Exhibit A, at 1). He was also ordered to only accept payment in connection from a customer and not a third-party, and to "affirmatively ask each customer whether that customer maintains any ties or affiliations with Hizballah." *Id.*

On October 13, 2021, the Government executed a search warrant in this case on SOS's (and formerly GSS's) business premises, which revealed a customer list report in Quick Books. A review of the SOS customer list contained undated entries for transactions with, among others, Ali Kharoubi and the Ellissa Group.

## B.   Kain Started Operating Under a New Business Name, SOS, Which Was Investigated by Canadian and U.S. Agencies for Customs Violations

In 2012, although nothing substantively changed about his business, Defendant began operating as a sub-chapter S corporation under the name of SOS. PSR 11 ¶12. In addition to SOS, Defendant also owned two additional businesses—SOS Transportation, Inc. and SOS Realty, LLC, both co-located with SOS. Like GSS, SOS operated primarily in the United States, Canada, and West Africa.

Like GSS, the basic way SOS operated was to contract with individuals seeking to ship automobiles to West Africa and provide that service for a fee. SOS arranged for the shipment of customers' vehicles from Canada or the United States

to West Africa or the Middle East via one or more independent shipping carriers. Sometimes SOS customers paid SOS upfront, in the United States, before shipment, and sometimes SOS customers remitted payment to an SOS agent in West Africa when the vehicles were delivered.  In order to ship the cars from Canada into the U.S. and then from the U.S. abroad, CBP required a dock receipt listing, among other things, the information of the shipper and vehicle. These documents were prepared by SOS and its employees and provided to the truckers and shipping companies.

SOS was under investigation recently for Customs violations involving dock receipts between 2015 and 2019.[1]  The Canada Revenue Agency investigated stolen cars shipped by Kain's business.  Records provided by CBP, and obtained via email search warrants, revealed numerous disparities between the dock receipts that were given to CBP for vehicles to enter the United States from Canada and those provided to international shipping companies upon vehicles' exit from the U.S.  Witness testimony confirms that *both* sets of dock receipts were prepared by SOS staff.  Witness statements, subpoenaed documents, email search warrant results, and the comparison of seized documents to other evidence, indicate that SOS often submitted dock receipts to CBP that were altered, and suspected to be

---

[1] The statute of limitations for a violation of 18 U.S.C. § 542, entry of goods by means of false statements, is five years.

7

fraudulent, when importing and exporting vehicles through third-party carriers.  It is unknown whether SOS employees did this in order to save on bond fees or to obscure the identity of the shippers of stolen vehicles.  In approximately December 2023, Kain was interviewed by HSI and provided no significant information that he was not otherwise required to maintain as a licensed freight forwarder.

Thus far, the government identified approximately 50 vehicles shipped by SOS with contradictory dock receipts.  And many of these vehicles were later identified by Canadian law enforcement as stolen.  For example, one dock receipt reflected the shipping of a stolen 2006 Mercedes by El H Auto:

Specialized Overseas Shipping

**DOCK RECEIPT**

| | |
|---|---|
| **2. EXPORTER** (Principal or seller-licensee and address including ZIP Code)<br>EL H AUTO<br>1522 RUE BERLIER<br>LAVAL, QC, CA, H7L 4A1, Tel: 438-923-8531,<br><br>ZIP CODE | **5. DOCUMENT NUMBER** S3-12745782   **5a. B/L NUMBER** HBL17-2227<br>**6. EXPORT REFERENCES** MBL: |
| **3. CONSIGNEE TO**<br>STE LAMAR SARL<br>SEME-KPODJI, EKPE PARC MIVO, Tel: 229-6667-4273,<br>COTONOU. BENIN | **7. FORWARDING AGENT** (Name and address - references)<br>Specialized Overseas Shipping<br>6425 TIREMAN, DETROIT, MI 48204. UNITED STATES<br>Phone: 313 279-0331    Fax: 313-279-5344<br>**8. POINT (STATE) OF ORIGIN OR FTZ NUMBER** NY/MNT |
| **4. NOTIFY PARTY / INTERMEDIATE CONSIGNEE** (Name and address)<br>KASSEM MOHAMAD<br>COTONOU, Tel: 229 62 70 10 00,<br>BENIN | **9. DOMESTIC ROUTING/EXPORT INSTRUCTIONS**<br>BAYONNE AUTO TERMINAL<br>51 PORT TERMINAL BLVD<br>BAYONNE, NJ 07002<br>PH: 201-215-2094 |

| **12. PRE-CARRIAGE BY** GRIMALDI GILNAVI LINE | **13. PLACE OF RECEIPT BY PRE-CARRIER** | | |
|---|---|---|---|
| **14. EXPORTING CARRIER** GRANDE LUANDA / GLU0217 | **15. PORT OF LOADING/EXPORT** New York | **10. LOADING PIER/TERMINAL** BAYONNE | |
| **16. FOREIGN PORT OF UNLOADING** (Vessel and air only) COTONOU | **17. PLACE OF DELIVERY BY ON-CARRIER** | **11. TYPE OF MOVE** Barge | **11a. CONTAINERIZED** (Vessel only) ☐ Yes  ☒ No |

| MARKS AND NUMBERS (18) | NUMBER OF PACKAGES (19) | DESCRIPTION OF COMMODITIES   in Schedule B detail (20) | GROSS WEIGHT (Kilos) (21) | MEASUREMENT (22) |
|---|---|---|---|---|
| | 1 VEH | 2006 MERCEDES-BENZ C-CLASS C230<br>VIN:WDBRF52J96F743186<br><br>HS CODE: 8703.23.30<br>Vehicle Value: $ 4000<br>Country Of Origin: GERMANY<br>NO EEI 30.37 (E) | 1,544.48 Kg<br>"3,405.00 Lb" | 390.33 ft³<br>"4,063.19 Vlb |

*Original Dock Receipt*

However, the dock receipt for the same vehicle provided to CBP listed Ghaddar

General Trading as the exporter:

*Dock Receipt Provided to CBP*

### C.     Defendant's False Payroll, Business, and Personal Income Tax Returns, and the October 2021 Search Warrant of SOS and Defendant's Residence.

On October 13, 2021, federal search warrants were executed at Kain's

business location for SOS and his personal residence.  In addition to typical

business records, the search returned a QuickBooks database covering 2006 to the

9

present that recorded all of the income and expenses for SOS, essentially serving as a general ledger.  The Government also seized data from Fingertec, a software package called Fingertec to record and track his employees' hours.  The Fingertec device was a fingerprint reader that employees used to clock in and out when coming to work and leaving for the day.

A comparison of the seized QuickBooks and Fingertec data to SOS's income and payroll tax returns filed with the IRS showed that Kain was systematically underreporting income and wages.  The tax preparer testified in grand jury that he was completely unaware of the existence of these two sets of data.[2]  Instead, the return preparers prepared Kain's payroll and business tax returns relying almost exclusively on Kain's SOS check register and bank records.  Employee interviews and testimony showed that Kain received a large volume of payments from SOS customers in cash.  This cash was not deposited into SOS domestic bank accounts and thus not reported to the tax preparer.  It was, however, recorded in Kain's internal SOS Quick Books database.  Kain also used this cash to, in part, pay his employees, pay some of the truckers he did business with, give to his children, and perhaps, pay expenses for his family members in Lebanon.

---

[2] All of the grand jury transcripts referenced herein are available to the Court upon request or at the sentencing hearing.

Kain filed his personal tax returns jointly with his wife, who was also an employee of SOS.  A review and analysis of Kain and his wife's returns, and those of the SOS subchapter S corporations, when compared to evidence obtained in the investigation, reveals significant inconsistencies.  For instance, from 2015 through 2018, bank records showed that Kain and his wife received more funds than what was reported to the IRS on their personal income tax returns.  The magnitude of Kain's personal and business unrecorded income is described in further detail *infra*, § III.B.2. (nature of the 7206(1) offense), III.C.1. (Kain's lifestyle), and IV (restitution).

### D.     Indictment, Restitution Negotiations, and Plea

On April 3, 2024, Kain was indicted on sixteen counts of failing to collect and pay over payroll taxes in violation of 26 U.S.C. § 7202 for quarters in 2017 to 2020.  ECF No. 1; PSR 4 ¶1.  He was also charged with four counts of filing false Forms 1120-S for SOS and four counts of filing false Forms 1040 in violation of 26 U.S.C. § 7206(1) for 2017 to 2020.  *Id.*

Following indictment, the Government engaged the defense on numerous occasions in attempt to resolve the dispute over restitution for Defendant's failure to accurately report SOS's income.  After a first round of talks in 2024, the Government, in good faith, accepted approximately $700,000 of Defendant's proposed expenses despite not providing the Government with proof.  *See infra*, §

IV.B.  However, when the Government accepted a lower restitution amount,

Defendant was apparently still not satisfied and again attempted to reduce the

restitution amount based solely upon his representations, which, after asking for

and receiving no corroboration (*see* Ex. 5), the Government now rejected.  The

Government's extensive attempts at trying to reach a reasonable agreement on

restitution are summarized in the Addendum to the PSR at A-2 through A-4.

Ultimately, Defendant Kain signed a written plea agreement, which,

although the parties agreed on the relevant Guidelines range, which was based on a

tax loss of between $500,000 and $1,500,000, they disagreed as to the amount of

restitution stemming from the unreported income of SOS.  On March 24, 2025, the

scheduled plea hearing was cancelled due to Defendant's failure to accept

responsibility on the record.  On April 9, 2025, Defendant finally pleaded guilty to

Count 4 of the Indictment, charging him with one count of willfully filing a false

tax return, 2020 Form 1120-S, in violation of 26 U.S.C. § 7206(1), and Count 24,

charging him with one count of willfully failing to collect, truthfully account for,

and pay over payroll taxes for the fourth quarter of 2020 in the approximate

amount of $12,297.17, in violation of 26 U.S.C. § 7202.  PSR 4 ¶4.  Defendant

agreed to make restitution payments as ordered by the Court, if necessary,

following an evidentiary hearing.

## III.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553

Sentencing begins with a properly calculated United States Sentencing

Guidelines range. *Gall v. United States*, 552 U.S. 38, 48-50 (2007).  After

calculating the Guidelines range, the sentencing court must consider the resultant

sentencing range along with factors listed in 18 U.S.C. § 3553(a) before arriving at

the final sentence. *Peugh v. United States*, 569 U.S. 530, 536 (2013).  To the

extent the Court is called upon to make findings of fact relevant to sentencing,

those findings must only satisfy the preponderance of the evidence standard.  The

Court may also rely on undisputed factual findings set forth in the Presentence

Investigation Report. Fed. R. Crim. P. 32(i)(3)(A).

The § 3553(a) factors support the Government's request for a sentence of 18

months incarceration.  First, regarding the nature and circumstances of the

offenses, Kain created an intricate system to track cash income and employee

wages internally, but did not give those same records to the tax preparer, which

would allow the preparation of accurate returns.  Second, regarding Defendant's

history and characteristics, Kain used these unreported proceeds, which were

mainly cash or overseas payments, to live a lavish, international, and cash-fueled

lifestyle, which he *still* denies to this day.  Moreover, his prior contacts with law

enforcement in terrorism and customs violations investigations shows that he is

willing to continue to violate the law despite having been confronted with serious

13

allegations.  Third, regarding general deterrence, this case is necessary to send a message to other would-be violators given that there were only eight tax prosecutions in Michigan during 2024.  Fourth, regarding specific deterrence, as demonstrated by his apparently self-prepared August 7, 2025, letter served via email to the Court, Kain has clearly not fully accepted responsibility given that he blames everyone but himself for his crimes and tries to paint himself as a pauper.  Finally, regarding sentencing disparities, other judges in the District have sentenced similar defendants to periods of incarceration ranging from 14 to 30 months.  Accordingly, a sentence of 18 months incarceration is appropriate.

### A.     3553(a)(4), the Sentencing Guidelines: Defendant's Conduct Falls Within a Range of 18 to 24 Months of Incarceration.

Pursuant to the plea agreement, the parties agreed that the tax loss falls within the range of $500,000 to $1,500,000, and stipulated to the following Guidelines calculation:

Statute Offense Level:

| | |
|---|---|
| *Base Offense Level:*[3] | 20 |
| | (§§ 2T1.1; 2T4.1(H) – loss greater than $550,000 but less than $1,500,000) |

---

[3] Because the § 7206(1) and § 7202 counts of conviction are grouped under U.S.S.G. § 3D1.2(d), the base offense level pertains to the § 7206(1) count of conviction, which carries the largest tax loss.  *See infra*, § IV.

<u>Total Offense Level</u>:                    20

<u>Zero-Point Offender Reduction (§ 4C1.1)</u>:   -2

<u>Total</u>:                                 18

The tax loss for the 7206(1) count in this case is $1,279,279. This includes the personal tax loss of $1,193,501, minus the allowance that the Government gave in the restitution context for unreported cash payroll. *See* U.S.S.G. § 2T1.1 cmt. 3 ("[T]he court shall not account for payments to third parties made in a manner that encouraged or facilitated a separate violation of the law (*e.g.*, "under the table" payments made to employees. . . .)."); *see also infra* § IV.B. Therefore, Defendant's conduct fits comfortably within this Guidelines range.

Assuming, as outlined in paragraph 7.B. of the plea agreement, that Defendant demonstrates to the satisfaction of the Government acceptance of responsibility prior to sentencing, the Government agrees that he should be afforded a further three-point offense level reduction pursuant to U.S.S.G. § 3E1.1(a) and (b). This would result in an adjusted offense level of 15 and a range of imprisonment of 18 to 24 months. However, given Kain's recent submissions to this Court appearing to renege on his responsibility, the Government reserves the right to withhold the extra point at sentencing.

## B.     3553(a)(1), the Nature and Circumstances of the Offenses

Both counts of conviction involve the same evasive conduct—Kain had one set of accurate internal records and provided another set to his tax preparer that omitted significant wages and business income.

As a threshold consideration, courts and policymakers have repeatedly emphasized that tax crimes are serious and that sentencing courts need to treat them accordingly.  *See, e.g.*, *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010) (citing U.S.S.G. Ch. 1., Pt. A, introductory cmt. 4(d) (1998)) ("[T]he policy statements issued by the Sentencing Commission make it clear that the Commission views tax evasion as a serious crime and believes that, under the pre-Guidelines practice, too many probationary sentences were imposed for tax crimes.").  Our nation and society depend upon the tax system, and that system in turn depends on individuals and employers honestly reporting their tax liabilities; as one court has put it, "the Federal tax structure is the ultimate honor system." *Turnham v. C.I.R.*, 979 F.3d 1322, 1323 (11th Cir. 2020); *see also Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting) ("Taxes are what we pay for civilized society. . . .").  Tax crimes undermine the integrity of the tax system, just as lies undermine any system built on trust.

16

    1.    <u>26 U.S.C. § 7202: Kain deceived his tax preparer by not disclosing his internal payroll database, paying cash wages, and he was complicit in Covid-related unemployment fraud.</u>

According to the electronic records seized on October 13, 2021, corroborated by witness testimony, Kain employed a system in which he paid SOS employees a set weekly amount by direct deposit and paid a second amount to employees in cash that amounted to at least half of employees' wages.  Grand Jury Testimony of C.K., Tr. 31:5, 39:6, 39:19; Grand Jury Testimony of H.S., Tr. 7:11-16, 8:15, 9:6-10.  Between 2017 and 2020, Kain had about ten to fifteen employees.  According to one employee:

> 6.  ███████████ stated all employees were paid in cash and received a payroll check. It wasn't a rule, but just the way it was and what she was told by KAIN when she was hired. KAIN did not want to pay overtime and she suspected he paid employees in cash because he did not want to pay additional taxes.  The cash payments were not included in her Form W2 amount.

Ex. 7, D.N. Interview at 2 ¶6.

Defendant used a software package called FingerTec to record and track his employees' hours.  Using the Fingertec system, SOS employees scanned their fingerprints on a device attached to the wall near the front door of the business when they clocked in or out of work.



| BADGENO | DATE | DAYTYPE | IN | BREAK | RESUME | OUT | OT | DONE | WORK | SHORT |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6/6/2014 | WORKDAY | 19:39 | 19:39 | 19:39 | 19:39 | 19:40 | 19:40 | 0 | 0 |
| 1 | 6/7/2014 | WORKDAY | 09:11 | | | 16:19 | | | 7.08 | 3.52 |
| 1 | 6/8/2014 | OFFDAY | | | | | | | 0 | 0 |
| 1 | 6/9/2014 | WORKDAY | 08:40 | | | 19:26 | | | 10.46 | 0.14 |
| 1 | 6/10/2014 | WORKDAY | 08:47 | | | 19:35 | | | 10.48 | 0.17 |
| 1 | 6/11/2014 | WORKDAY | 08:34 | | | | | | 0 | 0.04 |
| 1 | 6/12/2014 | WORKDAY | 08:58 | | | 18:45 | | | 9.47 | 1.13 |
| 1 | 6/13/2014 | WORKDAY | 08:53 | | | 18:28 | | | 9.35 | 0 |
| 1 | 6/14/2014 | WORKDAY | 09:31 | | | 15:34 | | | 6.03 | 4.57 |
| 1 | 6/15/2014 | OFFDAY | | | | | | | 0 | 0 |
| 1 | 6/16/2014 | WORKDAY | 08:55 | | | 19:09 | | | 10.14 | 0.46 |
| 1 | 6/17/2014 | WORKDAY | 08:49 | | | 16:25 | | | 7.36 | 3.24 |
| 1 | 6/18/2014 | WORKDAY | 08:57 | | | 18:35 | | | 9.38 | 1.22 |
| 1 | 6/19/2014 | WORKDAY | 08:48 | | | 18:54 | | | 10.06 | 0.54 |
| 1 | 6/20/2014 | WORKDAY | 08:44 | | | 17:49 | | | 9.05 | 0 |
| 1 | 6/21/2014 | WORKDAY | 08:55 | | | | | | 0 | 0.25 |
| 1 | 6/22/2014 | OFFDAY | | | | | | | 0 | 0 |
| 1 | 6/23/2014 | WORKDAY | 08:42 | | | 19:10 | | | 10.28 | 0.32 |
| 1 | 6/24/2014 | WORKDAY | 08:26 | | | 18:10 | | | 9.44 | 1.2 |
| 1 | 6/25/2014 | WORKDAY | 08:56 | | | 17:13 | | | 8.17 | 2.43 |
| 1 | 6/26/2014 | WORKDAY | 08:47 | | | 16:38 | | | 7.51 | 3.09 |
| 1 | 6/27/2014 | WORKDAY | 09:09 | | | 17:05 | | | 7.56 | 0 |
| 1 | 6/28/2014 | WORKDAY | 09:36 | | | 17:00 | | | 7.24 | 3.36 |
| 1 | 6/29/2014 | OFFDAY | | | | | | | 0 | 0 |
| 1 | 6/30/2014 | WORKDAY | 08:51 | | | 18:28 | | | 9.37 | 1.23 |
| 1 | 7/1/2014 | WORKDAY | 08:52 | | | 18:21 | | | 9.29 | 1.31 |
| 1 | 7/2/2014 | WORKDAY | 09:05 | | | 17:07 | | | 8.02 | 2.58 |

*Extracted Data from FingerTec device showing hours worked (column containing employee's name is omitted)*

An employee of the business would run payroll reports weekly and provide them to Kain. The reports detailed each employees' hours worked for the week, pay rate, and total pay for the period.

According to one employee, A.D., Kain paid his employees significantly more in cash during the pandemic, which allowed them to claim Covid-related unemployment payments:

> 12. (17:47) ██████ was provided a weekly paystub, but he did not keep the paystubs. ████ thought the majority of the employees received a very low payroll check and were paid mostly in cash, "especially" during Covid. The office was still operating and everyone except him were working from home. The employees were collecting unemployment and being paid cash for working at SOS.

Kain's children also claimed unemployment during the pandemic despite SOS making millions and Kain giving them weekly cash allowances.

According to witness testimony, and an analysis of relevant records, each employee was on average paid $200 per week by direct deposit based on the payroll information provided to the return preparer. *Id.* at 29:14-17. Kain paid the balance of the wages to employees in cash. Only the direct deposit portion of SOS's payroll was reported to the IRS, making the quarterly Forms 941 filed for SOS materially false—failing to report and pay the tax on approximately $330,000 in cash payroll payments from 2017 through 2020.

However, there were a few employees who did not clock in or out using the FingerTec system, and how their hours were tracked is unknown. Therefore, Defendant likely owes more in employment taxes than what is reflected in the Government's calculations, *infra*, § IV.

        2.     <u>26 U.S.C. § 7206(1): Defendant deceived the IRS and his tax preparer by failing to disclose his double-set of books and significant cash and overseas income.</u>

Payments from SOS's customers were recorded by Defendant or his employees into the SOS internal QuickBooks database:

**Specialized Overseas Shipping Inc**
**Transaction List by Customer**
January through December 2017

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Payment | 07/28/2017 | | Direct Bank ... | Undeposited Funds | | Accounts Re... | 950.00 |
| Payment | 08/22/2017 | | Direct Deposit | Undeposited Funds | | Accounts Re... | 1,100.00 |
| **0-AISHA HABIB** | | | | | | | |
| Invoice | 03/29/2017 | 28670 | Lome-17MC... | Accounts Receiva... | | -SPLIT- | 1,050.00 |
| Payment | 04/03/2017 | | Money Orde... | Undeposited Funds | | Accounts Re... | 1,075.00 |
| Invoice | 04/11/2017 | 29067 | OH-DET: 201... | Accounts Receiva... | | -SPLIT- | 1,025.00 |
| Payment | 06/09/2017 | | Money Order | Undeposited Funds | | Accounts Re... | 1,050.00 |
| **0-ALEXTOPHER AUTO SALES** | | | | | | | |
| Invoice | 06/12/2017 | 29372 | Lagos-17CH... | Accounts Receiva... | | -SPLIT- | 975.00 |
| Invoice | 06/16/2017 | 29403 | PGA0317- L... | Accounts Receiva... | | -SPLIT- | 975.00 |
| Invoice | 06/16/2017 | 29404 | PGA0317-LA... | Accounts Receiva... | | -SPLIT- | 1,200.00 |
| Payment | 07/01/2017 | 1868 | check# 1868 | Undeposited Funds | | Accounts Re... | 975.00 |
| Payment | 07/26/2017 | | Paid at desti... | Undeposited Funds | | Accounts Re... | 500.00 |
| Payment | 07/26/2017 | | CHECK# 1876 | Undeposited Funds | | Accounts Re... | 700.00 |
| Payment | 07/29/2017 | | Paid at desti... | Undeposited Funds | | Accounts Re... | 975.00 |
| **0-ALHASSAN ABDUL KAMARA** | | | | | | | |
| Payment | 09/13/2017 | | AMEX - 8630 | Undeposited Funds | | Accounts Re... | 2,665.00 |
| Invoice | 09/23/2017 | 30396 | OCN171619... | Accounts Receiva... | | -SPLIT- | 5,330.00 |
| Payment | 10/05/2017 | | Visa - x 100... | Undeposited Funds | | Accounts Re... | 2,665.00 |
| Invoice | 10/23/2017 | 30740 | DHL - Freeto... | Accounts Receiva... | | -SPLIT- | 90.00 |
| Payment | 10/30/2017 | | VISA 1008 ... | Undeposited Funds | | Accounts Re... | 90.00 |
| **0-ALIYU ABDULLAHI SARINA** | | | | | | | |
| Invoice | 10/05/2017 | 30546 | Lagos-17GP... | Accounts Receiva... | | -SPLIT- | 1,370.00 |
| Invoice | 10/20/2017 | 30700 | COT-17AE0... | Accounts Receiva... | | -SPLIT- | 1,140.00 |
| Invoice | 10/31/2017 | 30828 | Lagos-17AE... | Accounts Receiva... | | -SPLIT- | 1,050.00 |
| Invoice | 11/01/2017 | 30830 | Lagos-PGA0... | Accounts Receiva... | | -SPLIT- | 1,300.00 |
| Invoice | 11/13/2017 | 30930 | Lagos-17AE... | Accounts Receiva... | | -SPLIT- | 1,180.00 |
| Invoice | 11/16/2017 | 30984 | Lagos-17GN... | Accounts Receiva... | | -SPLIT- | 1,400.00 |

*Example of a QuickBooks Customer Profile Showing Logged Invoices and Payments*

SOS received a large volume of payments from customers in cash, much of which was marked "paid at destination," which, according to employee interviews, meant that SOS was either paid in cash domestically or received payments to agents located overseas.  C.K. Testimony, Tr. 18:13-18:22.  C.K., Kain's office manager, verified that Kain received a large volume of cash that was not deposited into domestic bank accounts but was recorded in the SOS internal Quick Books database.  *Id.* at 13:13-15:19.  C.K. testified:

```
14        Q.   So it is your understanding that these paid at

15   destination, like this one here I'm pointing to, $1,200,

16   that that's -- actually reflects a cash payment?

17        A.   Yes, that's a cash payment.

18        Q.   And another one here, $1,100?

19        A.   That's cash.

20        Q.   But he doesn't say cash, he says paid at

21   destination.  Do you know why he used that term instead of

22   cash?  Did he ever tell you, I should say, why he used this

23   description instead of the word cash?

24        A.   He would just, he ordered, told us to put cash, I

25   mean, paid at destination on there.  I'm not sure for what
```

C.K. Grand Jury Testimony, 25:14-25.  Another SOS employee, D.N., stated:

> 11. Customers who came into the office regularly paid cash. KAIN would put the
>     cash in his desk drawer, he did not have a safe.

Ex. 7, D.N. Interview, at 2 ¶11.  C.K. also testified that Kain used part of this cash to pay his employees, truckers, for repairs, and other expenses.  C.K. Testimony at 24:18-24:23.  To corroborate the QuickBooks entries, IRS-CI also interviewed numerous clients of SOS, which confirmed that they routinely paid in cash or to overseas agents of SOS, and also undertook a reconciliation of the bank accounts to the QuickBooks.

When the QuickBooks database is compared to the information Defendant provided to his paid professional income tax return preparers, there is a large variation in gross receipts as illustrated here:

| Calendar Year | Appx. Filing Date | Gross Receipts Reported | Appx. Unreported Gross Receipts |
|---|---|---|---|
| 2017 | April 15, 2018 | $ 3,906,245 | $ 1,193,399 |
| 2018 | April 15, 2019 | $ 6,945,817 | $ 1,384,911 |
| 2019 | April 15, 2020 | $ 6,437,221 | $ 2,672,316 |
| 2020 | April 15, 2021 | $ 7,645,344 | $ 1,580,944 |
| **TOTAL** | | | **$ 6,831,570** |

And Defendant still does not accept that he made a substantial profit during this period, instead trying to backhandedly attack his acceptance of responsibility by claiming that there is a minimal tax loss to the Government.  However, the evidence makes clear that SOS's income was underreported by millions of dollars. According to the Forms 1120-S that SOS filed, it was barely operating at a profit most years:

22

|                  | 2016   | 2017    | 2018      | 2019     | 2020     |
|------------------|--------|---------|-----------|----------|----------|
| **Ordinary income:** | $6,176 | $31,414 | -$53,224 | $140,083 | $184,416 |

This would have made SOS's profit margins .20% in 2016, .80% in 2017, -.77% in 2018, 2.2% in 2019, and 2.4% in 2020.  Yet the average net profit for businesses in the "air, rail, and water transportation" industries is about 8.3%.  *See* IRS, *2020 Income Tax Returns Complete* Report, at 18, *available at* https://www.irs.gov/pub/irs-prior/p16--2023.pdf.

Using Kain's own records, comparing the number of vehicles SOS shipped to the amount of reported income, the reported income per vehicle shipped was insufficient to cover the costs of shipping these vehicles, not to mention cover payroll and other overhead—a non-sensical result.  To illustrate, Kain's shipping records for 90 vehicles that he shipped between 2019 and 2021 showed that it costed on average $940 to ship a vehicle from the U.S. to West Africa.  Yet SOS's per vehicle gross income based on the tax returns was significantly less than $940 per vehicle:

| Tax Year | Reported Gross Receipts | No. Vehicles Exported | Gross Receipts/Vehicle |
|----------|-------------------------|-----------------------|------------------------|
| 2014 | $15,885,143 | 18,019 | $881.58 |
| 2015 | $7,961,515 | 13,494 | $590.00 |
| 2016 | $3,107,140 | 4,606 | $674.59 |
| 2017 | $3,906,245 | 6,891 | $566.86 |

23

| **2018** | $6,945,817 | 10,714 | $648.29 |
| **2019** | $6,437,221 | 12,465 | $516.42 |

Kain also paid personal expenses from the business account and took shareholder loans from the business regularly.  If SOS truly was barely operating at a profit, it would not have the money to loan Kain.  Kain directed his accountants which transactions to treat as loans and which to treat as distributions.

Defendant also diverted corporate funds for personal use, which again would not have been possibly if it was running at a level of profit consistent with what he tells the Court.  For example, records show that Defendant made a payment of $10,000 on December 6, 2017, on a personal credit card (Bank of America).  The payment came from a balance transfer from a different personal credit card (Comerica Bank).  On December 14, 2017, Defendant took a $15,000 advance from the Bank of America card and deposited the proceeds into his personal bank account at Chemical Bank.  On December 19, 2017, Defendant wrote a $8,000 check to his son, K.K., with the memo line "loan."  K.K. then transferred $5,000 of the funds to his Coinbase virtual currency account.

Therefore, the evidence shows that Kain was making a large amount of cash and overseas income that was used to fuel his lifestyle and pay employees in cash.

## C.   3553(a)(1), the History and Characteristics of the Defendant

As a threshold consideration, Kain did not suffer adversities that would provide context for why he violated the law, such as a poor childhood, abuse, or

substance abuse issues.  PSR 14 ¶36, 15 ¶¶47-49.  In fact, he had a good
upbringing, is well-educated, and has the support of his family.  The only
explanation for his intricate lies is his greed.  *United States v. Shah*, 69 F.3d 538
(6th Cir. 1995) (noting the sentencing court's "comment[] on the 'rank greed' that
motivated defendants to act in violation of the law and their continued efforts to
conceal their wealth").

     1.    <u>Kain lived an international, lavish, and cash-fueled lifestyle.</u>

As stated above, many of the payments to SOS agents overseas were likely
kept offshore and possibly transferred to Lebanon.  Notably, **Kain failed to
disclose any of his overseas assets to the Probation Officer.**  Rather, the
Government had to supply that information.  PSR 16 ¶58.  Specifically, according
to emails, Kain took out a 120-month mortgage on a Lebanese property in 2017:

From:        Mohamad Imad Khalil <khalilmoh@bankmed.com.lb>
To:          ALI KAIN <kainali@aol.com>
CC:          Mohamad Abou El Hassan <ahassanm@bankmed.com.lb>
Sent:        1/16/2019 7:12:05 AM
Subject:     RE: conversion - BDL HL - Dr. Ali Kain

Hello Dr. Kain,

Reference to our phone call yesterday, please find below requested details regarding your loan:

1- Requested amount: LBP 455,000,000
2- Outstanding amount: LBP 420,400,000
3- Tenor: 120 months
4- Number of bills settled: 17 pmts
5- Interest rate: 25% of 1yr. TB, currently 5.35% + 2.9% = 4.24%.
6- Monthly payment: LBP 4,855,800
7- Loan was signed on 13-07-2017
8- First payment was on 31-08-2017
9- Last payment due on 31-07-2027

So far, you have settled the total amount of around LBP 64,000,000, out of which :
-   LBP 34,600,000 for the principal amount
-   LBP 29,400,000 for the interest amount

Kain's U.S. bank accounts do not show any payments made to Bank Med in Lebanon ($3,500 per month), and there is no indication on his income tax returns of when and how Kain paid down his loan balance with Bank Med from 277,730 Lebanese pounds to 64,000 in less than two years – a strong indication of unreported foreign-sourced funds.  Indeed, Kain's wife (name redacted) corroborated that they owned an apartment in Lebanon:

26

```
                   ████     ██         travels to Lebanon approximately every three years.
KAIN and    ████      ███   own an apartment in Lebanon. They use this property to stay
in when they travel. It is cheaper to own an apartment than to use hotels in
Lebanon. ███████   is not aware of any other properties owned by KAIN in the
United States or in another country. KAIN and     ████     will take cash with
them when they travel to Lebanon. Once in Lebanon, they will either use USD
or exchange it for Lebanese Lira.
```

Further evidencing his overseas activity, one witness stated that Kain shipped a Range Rover to Lebanon that he or his wife purchased.  Ex. 2 at 4, ¶ 19.  All but one of Kain's siblings live in Lebanon.  Indeed, it makes no logical sense why Kain would not also have a Lebanese bank account rather than traveling to a politically unstable country with enormous amounts of cash.  Yet no international assets were disclosed to the Court.[4]

Kain used the unreported business income to pay personal expenditures in cash and take loans from the business.  He lived an opulent lifestyle.  He paid for his children's college educations and leased them each new vehicles.  At the time of the search warrant Kain owned or leased a 2021 Lincoln Navigator, 2021 Jeep Grand Cherokee, 2021 Dodge Ram, 2020 Jaguar E-Pace, and a 2020 BMW 530.  During the search warrant, agents photographed numerous luxury goods and

---

[4] Lebanon and Benin do not have tax treaties or MLATs in place to make it possible to make official requests for bank or business records.  It is not known what happened to all the funds that were collected overseas on behalf of SOS.

expensive furnishings, including marble pillars and a custom kitchen as shown in

Ex. 4:







Transactions from his bank accounts alone—not even including cash payments—far exceed what was reported on his return.  For example, in 2017 Kain and his wife spent $309,937.96 from their personal bank accounts, but only declared about $200,000 in income.

Additionally, Kain paid his family members thousands in cash allowances:



████████ does not conduct any banking transactions for SOS. ████████ does n receive pay specifically for the work he does at SOS. He simply gets paid a weekly allowance of approximately $500. He is paid via cash from KAIN an direct deposit from SOS. ████████ banks at Chase Bank and has only one

K.K. Interview (Kain's son).

however, she does not know what SOS does. She did not review or sign off on anything. She receives a weekly allowance of $200 regardless of working. She is paid via cash. She banks at Comerica Bank and has only one bank account.

A.K. Interview (Kain's daughter).

administrative and clerical work, and responsible for depositing money into the business bank account. ████████ received approximately $500/week either as cash or check when she was employed at SOS. ████████ used this money to purchase items for her house. The COVID-19 pandemic affected SOS, however,

M.B. Interview (Kain's wife).  Indeed, the search warrant at Kain's residence revealed approximately $200,000 in cash (Ex. 4):



**2.**   <u>Kain past lies to financial institutions and numerous prior
contacts with the legal system weigh in favor of a custodial
sentence.</u>

Although Defendant has no prior convictions, the instant offenses are far

from his first contact with law enforcement.  And the Court may consider this

evidence as part of the Defendant's history and characteristics to the extent that it

showed he had ongoing contact with law enforcement.  *See United States v.*

*Williams*, 807 F. App'x 505, 508 (6th Cir. 2020) ("Because these pending and

dismissed charges form a part of Williams's 'background' and 'conduct,' the

district judge properly considered them in determining his sentence. . . . The

district judge relied on these charges to show that Williams had 'ongoing contact with law enforcement.'").  Here, there are at least three instances of uncharged conduct that merit consideration: his settlement with the government in the Southern District of New York regarding allegations of associations with Hezbollah, his likely customs violations, and his lying to financial loan companies.

As explained *supra*, § II.A, Kain's former business, GSS, was associated with entities that were accused of laundering money to Hezbollah through the used car industry.  Ex. 3.  In his settlement, Kain, among other things was required to "properly file IRS Form 8300s and any other required cash reporting documents." *Id.* at 9 (Exhibit A, at 1).  And he was ordered to "affirmatively ask each customer whether that customer maintains any ties or affiliations with Hizballah."  *Id.* However, after reviewing SOS's emails, the Government found no evidence that Kain asked whether a customer had ties to Hezbollah.  Moreover, despite earning hundreds of thousands—and possibly millions—of dollars in cash during 2017 to 2020, Kain filed no Forms 8300 with the IRS.[5]  Second, as explained *supra*, § II.B., SOS employees would regularly alter dock receipts that were provided to CBP, in violation of customs laws.

---

[5] Because SOS did not keep good records of how they received cash payments, the Government is unable to determine whether they ever received a single payment of cash over $10,000 that would trigger the filing requirement.

Third, Defendant lied to financial institutions.  In 2017, Defendant obtained a $242,000 loan from Funding Circle with a monthly payment of $8,555.  In a September 2017 email with Funding Circle, Defendant claimed that he planned to use the funds for working capital for SOS.  Instead, Defendant gave these loan proceeds to his brother.  In early 2018, Defendant applied for a business loan with Straight Line Source, but the loan was denied.  However, in an email exchange with a Straight Line Source branch manager, Defendant said that he didn't have to tell the truth about the previous $250,000 loan from Funding Circle, which ultimately went to his brother.  Defendant stated: "but the truth is, I have never taken a loan at high interest in my life.  My brother started a small business and needed help and no one would give him a loan because his company is new and had no history.  He asked me to assist him and he would pay this short term loan.  I did.  Whether the loan is for SOS or my brother, who cares, as long as it is under SOS Shipping.  Good or bad, the loan is there."

In 2017, an underwriter asked Defendant about SOS's loans to shareholders (Defendant being the only shareholder) and why these loans were taken out. Defendant responded:

> This money is a combination of personal withdraws over the past 4 years.  Most of it was to pay for 2 life insurance policies (over $40k per year), **house upgrades**, among other needs.  I had the choice to consider it income and has it taxed or take it as a loan hoping to get it offset during a highly profitable year.  Most likely, we will start partially

break it as annual income over the next few years.  We have not decided yet. **I do not feel bad about**, I built this company from ZERO and the early years, I put lots of injections into it.  If any, it shows that the company was and continues to be profitable.  I own it 100%.

### D.     3553(a)(2), General Deterrence

General deterrence for tax crimes has taken on renewed importance in the current political climate.  Due to recent large-scale reductions in the IRS's workforce, there have been numerous news articles suggesting that the government would not enforce tax compliance.  *See, e.g.*, Brookings, *A Hamstrung IRS is a Gift to Rich Tax Cheats and a Headache for Honest Taxpayers* (Mar. 6, 2025), *available at* https://www.brookings.edu/articles/a-hamstrung-irs-is-a-gift-to-rich-tax-cheats-and-a-headache-for-honest-taxpayers/.  And given the relatively low level of tax prosecutions—for example, there were only eight tax prosecutions in the state of Michigan during 2024—this factor weighs heavily in favor of a custodial sentence to serve as an example to would-be violators.  U.S. Sentencing Commission, *Statistical Information Packet for Fiscal Year 2024 for the State of Michigan*.[6]  Moreover, this case has already received local press, and if a non-custodial sentence were rendered and reported on, it may serve as an example that serious tax violations like these have minimal penalties.  Dane Kelly, Local 4

---

[6] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/mi24.pdf (last visited Aug. 4, 2025).

Detroit, *Metro Detroit business owner faces 23 federal charges, accused of withholding millions from IRS* (June 12, 2024).[7]

The government relies heavily on deterrence to successfully enforce the internal revenue laws—more so than many other statutes. The reason is simple: the number of taxpayers in the United States far exceeds the number of auditors and criminal investigators available at the IRS. Absent clear consequences, individuals such as the defendant may decide that the benefits of cheating the tax system outweigh the risks of getting caught. In fiscal year 2023, the IRS received 36 million payroll tax returns, and 163 million individual income tax returns. 2023 IRS Data Book, Table 2.[8] The IRS simply cannot review all tax returns for accuracy. And due to the sheer numbers involved and limited resources, only a small portion of tax offenders are pursued criminally. The IRS Criminal Investigation program initiated just 2,676 investigations of tax crimes in fiscal year 2023. *Id*. at Table 26. As the Eighth Circuit noted in *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006):

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from

---

[7] *Available at* https://www.clickondetroit.com/news/local/2024/06/12/metro-detroit-business-owner-faces-23-federal-charges-accused-of-withholding-millions-from-irs/ (last visited Aug. 6, 2025).

[8] *Available at* https://www.irs.gov/statistics/soi-tax-stats-irs-data-book-index-of-tables.

> violating tax laws is a primary consideration underlying [the Sentencing Guidelines]. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

*Id.* at 357 (quoting U.S. Sentencing Guidelines Manual ch. 2, pt. T, introductory cmt.).

The size of the U.S. "tax gap" – that is, the difference between what is owed and what is paid – also makes clear the need for deterrence.  The tax gap, which was $90 billion in 1987, has since grown sixfold to $606 billion, as of the IRS's most recent comprehensive study for tax year 2022.  *See* IRS, *IRS: the Tax Gap* (Apr. 14, 2025) *available at* https://www.irs.gov/statistics/irs-the-tax-gap.  This tax gap of more than half a trillion dollars, which has likely increased since the IRS issued its study, is a staggering sum.  Tax crimes – both those involving the underreporting of income, and those involving claims of unwarranted refunds – often go undetected.  This case presents an ideal opportunity for this Court to deter other business owners like the defendant who would act out of greed and abuse the tax system by intentionally filing false information with the IRS.  Absent such deterrence, individuals like the defendant may cynically decide that the benefits of noncompliance outweigh the risks of getting caught and the ensuing punishment, thus contributing to the growing U.S. tax gap.  A probationary sentence would send the wrong message: that failing to comply with environmental and tax obligations is merely a strategic business decision.  *See United States v. Engle*, 592

37

F.3d 495, 501 (4th Cir. 2010) ("[T]he policy statements issued by the Sentencing Commission make it clear that the Commission views tax evasion as a serious crime and believes that, under the pre-Guidelines practice, too many probationary sentences were imposed for tax crimes").

**E.      3553(a)(2), Specific Deterrence: Kain's Continued Lies to the Court and Minimization of His Conduct Demonstrate a Need for Specific Deterrence**

The Court need only read Defendant's August 7, 2025, email submission to the Court to see that he has not fully accepted responsibility.  Instead of taking responsibility for his employment tax crimes, he blames his employees: "During pre-pandemic and pandemic times, my employees demanded that I pay part of their wages in cash without withholding taxes from them."  Def. Submission at 5.  This not only sounds ridiculous, it is also a lie, given employees' statements that Kain was the one who told them he would pay them partly in cash.  *See, e.g.*, Ex. 7, D.N. Interview at 2 ¶6.

He also continues to minimize his income and omit assets, stating "Other than my home, family and business I have no significant assets nor interests," Def. Submission 3, and continues to wrongly assert that "SOS was and is a struggling business," *id.* at 7.  As stated above, Kain had real estate and likely other assets in Lebanon, and his lavish and cash-fueled lifestyle shows that SOS was far from a "struggling" business.  Interestingly, Kain only characterizes his business as

"struggling" when it suits him.  As he told a loan company in a September 28,

2017 email responding to the company's question about a loan to shareholder:

The business tax returns showed a $231,777 loan that was taken out by a shareholder. Was this shareholder you? **Why was this money taken out? This money is a combination of personal withdraws over the past 4 years. Most of it was to pay for 2 Life Insurance polices (Over $40K per year) , house upgrades, among other needs. I had the choice to consider it income and has it taxed or take it as loan hoping to get it offset during a highly profitable year. Most likely, we will start partially break it as annual income over the next few years. We have not decided yet. I do not feel bad about, I built this company from ZERO and the early years, I put lots of injections into it. If any, it shows that the company was and continues to be profitable. I own it 100%.**

Finally, instead of taking responsibility for not providing his accountant with

accurate records, he now blames his failure to do so on being worried his tax

preparer was too busy.  Def. Submission 16.  Given that Kain continues to find

himself in the path of law enforcement, a custodial sentence would serve as a

deterrent, as he clearly believes he can violate the law without consequences.

### F.    3553(a)(6), the Need to Avoid Unwarranted Sentence Disparities

The Government recommends that the Court sentence Defendant to 18

months incarceration.  Ali Kain devised a scheme to deceive his tax preparers and

the IRS by failing to disclose internal documents that would allow them to assess

the correct tax liabilities.  Given Defendant's past history and the fact that he was

on notice to keep accurate records and file cash transactions with the IRS from his

civil settlement, he has demonstrated a disrespect for the legal system.  Moreover,

although he plead guilty, his attempt to essentially reduce his tax liability to zero

directly contravenes his acceptance of responsibility.  The tax liability of around

$1.3 million approaches the top of the Guidelines range.  Given these factors, a

custodial sentence is appropriate, as opposed to a probationary sentence which is normally limited to cases involving low tax losses, government cooperators, or complete, early acceptance of responsibility.  Further, according to the Sentencing Commission's 2023 Sourcebook of Federal Sentencing Statistics,[9] almost 65 percent of sentences for tax offenses included some period of incarceration, with a mean custodial sentence of 22 months and a median of 15 months.

Some similar cases include (notably though, these cases to not involve the distinct crime of § 7202):

- *United States v. Christopher Fratine*, 19-cr-20497-TLL-PTM (E.D. Mi. Sept. 30, 2021): Defendant received **30 months** in prison after pleading guilty to one count of filing a false return, 26 U.S.C. § 7206(1), and one count of aiding or assisting in the presentation of a false return, 26 U.S.C. § 7206(2).  ECF No. 34.  According to the plea agreement, ECF No. 19, Fratine hired a CPA to prepare his returns, but he failed to disclose about $3 million in gross receipts by keeping separate bank accounts of which he did not inform his preparer.

- *United States v. Chandra Yarlagadda*, 19-cr-20664-GAD-RSW (E.D. Mi. Aug. 9, 2021): Defendant received **30 months** in prison after to one count of filing a false tax return, 26 U.S.C. § 7206(1).  ECF No. 27.  According to the plea agreement, ECF No. 8, Defendant overstated expenses on personal income tax returns, resulting in a tax loss of around $2.3 million.  According to the Government's sentencing memorandum, Defendant likewise committed Customs violations.  ECF No. 24, at 4-5.

- *United States v. Mersed Bebanic*, 18-cr-20680-PDB-APP (E.D. Mi. Mar. 20, 2019): Defendant received **14 months** in prison after pleading to one count of tax evasion, 26 U.S.C. § 7201, where he caused a tax loss of

---

[9] *Available at* https://www.ussc.gov/research/sourcebook-2023 (last visited Aug. 4, 2025).

approximately $1.2 million and provided false information to his tax return preparer.  ECF Nos. 10, 14.

This case is distinguishable from the following defendants that received probationary sentences:

- *United States v. Brandon Johnson*, 20-cr-20587 (E.D. Mi. May 6, 2024): The defendant pleaded to two counts of filing a false tax return, 26 U.S.C. § 7206(1), and received a probationary sentence following the Government's motion for a downward departure due to defendant's substantial assistance to the Government.

- *United States v. Ronnie Wonsey,* 23-cr-20578 (E.D. Mi. Feb. 28, 2024): The defendant pleaded to one count of filing a false tax return, 26 U.S.C. § 7206(1), which caused a tax loss of only $75,823, putting her Guidelines range at 12-18 months, within Zone C.

Fashioning the Guidelines for tax offenses, the Sentencing Commission sought not only to achieve consistent sentences for similar tax crimes, but also to eliminate disparities in sentencing between white-collar offenses and equally serious non-white-collar offenses.  As former Justice Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

41

*See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20 (1988).  Accordingly, given Defendant's conduct, this factor weighs heavily in favor of a custodial sentence.

## IV.   RESTITUTION

The Government requests a restitution order in the amount of $1,319,229, including $125,728 for payroll taxes and $1,193,501 for personal taxes.[10]  The Government believes that the Court can decide the outstanding factual issues without a hearing because the Government and defense agree that he failed to report gross receipts.  Under the Guidelines, it then becomes *Defendant's* burden to prove additional expenses to the Court.  *See* U.S.S.G. § 2T1.1 cmt. 3 ("The burden is on the defendant to establish any such credit, deduction, or exemption by a preponderance of the evidence.").  For the reasons below, Defendant has not established any additional expenses in excess of the approximately $3.1 million that the Government has already allowed in good faith.  However, the Government will be prepared to offer the testimony of an IRS Revenue Agent at sentencing should the Court require testimony.

When calculating restitution, the district court may make a reasonable

---

[10] Notably, the personal tax loss only included conduct between 2017 and 2020 because the Government agreed in the plea agreement to limit the tax loss to relevant conduct during those years.  However, Kain's QuickBooks database, and the Government's losses, really stretch back as far as 2006.

estimate of the loss caused by the defendant's criminal conduct. *United States v. Osman*, 853 F.3d 1184, 1189 (11th Cir. 2017) (recognizing that "a district court may accept a reasonable estimate of the loss based on the evidence presented" (cleaned up)); *United States v. Harmon*, 944 F.3d 734, 738 (8th Cir. 2019); *United States v. Carmichael*, 676 Fed. App'x 402, 406 (6th Cir. 2017); *United States v. Petlechkov*, No. 21-5174, 2022 WL 168651, at *4 (6th Cir. Jan. 19, 2022) (unpub.). This is particularly true when a defendant has kept inadequate records, making it impossible to determine the precise loss amount. *See Carmichael*, 676 Fed. App'x at 406; *see also United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) ("The use of estimation is permitted because it is sometimes impossible to determine an exact restitution amount." (cleaned up)); *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (in Guidelines context, recognizing that "where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information").

## A. The Parties Stipulated to an Employment Tax Loss of $125,738.

According to the plea agreement, the parties stipulated to an employment tax loss of $125,728. PSR 6, 12:14. The following includes the trust fund taxes.

| Tax Quarter | Unreported (Cash) Wages | Tax Loss |
|---|---|---|

| | | |
|---|---|---|
| Q1 2017 | $18,404.22 | $6,008.98 |
| Q2 2017 | $16,516.38 | $5,392.60 |
| Q3 2017 | $17,661.87 | $5,766.60 |
| Q4 2017 | $19,301.31 | $6,301.88 |
| Q1 2018 | $22,331.38 | $6,621.25 |
| Q2 2018 | $19,076.44 | $5,656.17 |
| Q3 2018 | $14,934.56 | $4,428.10 |
| Q4 2018 | $19,144.65 | $5,676.39 |
| Q1 2019 | $21,355.10 | $6,331.79 |
| Q2 2019 | $21,865.36 | $6,483.08 |
| Q3 2019 | $23,182.29 | $6,873.55 |
| Q4 2019 | $23,899.38 | $7,086.16 |
| Q1 2020 | $22,730.42 | $6,739.57 |

|  |  |  |
|---|---|---|
| Q2 2020 | $10,153.03 | $3,010.38 |
| Q3 2020 | $19,291.37 | $5,719.89 |
| Q4 2020 | $41,474.40 | $12,297.17 |
| **Totals** | **$331,322** | **$100,393** |

Further, the tax loss includes relevant conduct of an additional $25,345 representing the employer's matching portion of the trust fund taxes, which amounts to an aggregate payroll tax loss of $125,738.  Therefore, the Government requests restitution in this amount.

> ### B.    Defendant Owes $1,193,501 in Restitution for His Failure to Report Income from SOS

The parties agreed that Defendant failed to report gross receipts from 2017 to 2020 of approximately $6.4 million.  PSR 6.  As explained *supra*, § III.B.2., the majority of the unreported gross receipts consist of QuickBooks entries designated as "paid at destination" or "cash."

The following table represents the total QuickBooks payment entries and the unreported gross receipts:

| YEAR | CATEGORIES FROM SPECIALIZED OVERSEAS SHIPPING QUICKBOOKS - PAYMENTS | | | | | | | | | | | | | TOTAL YEARLY SOS QB PAYMENT ENTRIES | LESS: TAX RETURN GROSS RECEIPTS | UNREPORTED GROSS RECEIPTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DEBIT | CREDIT CARD | PAID AT DESTINATION | WIRE TRANSFER | MONEY ORDER | REC & SETTLEMENT | DIRECT DEPOSIT | AGENT PROFIT | DIRECT | CHECKS | CASHIER CHECK | CASH | | | | |
| 2017 | 338,846 | 8,077 | 1,363,547 | 2,371,544 | 240,372 | - | 61,479 | - | - | 635,152 | 35,754 | 44,873 | $ 5,099,644 | $ 3,906,245 | $ 1,193,399 |
| 2018 | 653,569 | 2,838 | 1,514,832 | 4,686,812 | 620,611 | - | 6,145 | - | - | 752,766 | 19,928 | 73,227 | $ 8,330,728 | $ 6,945,817 | $ 1,384,911 |
| 2019 | 943,637 | 29,351 | 1,556,830 | 4,809,001 | 584,175 | - | 17,600 | - | - | 955,231 | 35,095 | 178,618 | $ 9,109,537 | $ 6,437,221 | $ 2,672,316 |
| 2020 | - | 50,185 | 1,306,327 | 3,944,879 | 1,855,812 | 339,170 | | 925 | 51,045 | 1,060,470 | 264,238 | 353,236 | $ 9,226,288 | $ 7,645,344 | $ 1,580,944 |

| | |
|---|---|
| TOTAL SOS QB PAYMENT ENTRIES | $ 31,766,197 |
| TOTAL TAX RETURN GROSS RECEIPTS REPORTED | $ 24,934,627 |
| TOTAL UNREPORTED GROSS RECEIPTS | $ 6,831,570 |

*Ex. 8.*

As part of the negotiations described *supra*, § II.D., the Government in good faith allowed many of Defendant's proposed cash expenses totaling around $3,153,430.24, which are summarized here:

| ADDITIONAL EXPENSES | | | | | | |
|---|---|---|---|---|---|---|
| **DESCRIPTION** | **TYPE OF EXPENSE** | **2017** | **2018** | **2019** | **2020** | **SOURCE OF EXPENSE** |
| COGS - Atlantic Container Lines / Grimaldi | Ocean Freight | $ (794,442.00) | | | | Search Warrant Document |
| COGS - Sallaum | Ocean Freight | - | $ (44,924.00) | $ (2,788.80) | $ (880,354.84) | Defense Provided / Subpoenaed Records |
| COGS - Concepts in Freights | Ocean Freight | (103,373.53) | (43,294.00) | (55,059.00) | (151,608.00) | Defense Provided / Subpoenaed Records |
| Agent Profit Sharing | Agent Profit Sharing | (5,100.00) | (6,893.95) | (22,215.00) | (925.00) | Accepted Defense's Representation |
| W. Africa Agents: Agents Handling Expense | Unknown | (8,415.00) | (48,710.00) | (76,686.00) | (148,883.00) | Accepted Defense's Representation |
| COGS - Hoegh Auto Liners | Ocean Freight | (32,000.00) | | | | Defense Provided / Subpoenaed Records |
| Destination Agent Fees | Fees | (2,225.00) | (1,675.00) | (2,750.00) | | Accepted Defense's Representation |
| Apply Against Balance (Adjusted) | Unknown | (12,397.00) | | | | Accepted Defense's Representation |
| Cash Payroll to Employees | Wages | (56,154.65) | (57,862.48) | (77,320.80) | (57,510.28) | Search Warrant Records |
| Wire Bank Fees | Fees | (763.00) | (1,402.00) | (625.00) | (945.00) | Accepted Defense's Representation |
| Transportation Paid with Cash and Money Orders - Local | Transportation | (97,043.00) | (55,401.00) | (53,735.00) | (61,288.16) | Accepted Defense's Representation |
| Transportation Paid with Cash and Money Orders - Detroit to Ports | Transportation | | (4,200.00) | (4,000.00) | (14,700.00) | Defense Provided / Search Warrant Records |
| Transportation Paid with Cash and Money Orders - Ocean Freight | Ocean Freight | | (6,500.00) | | (55,440.00) | Accepted Defense's Representation |
| Transportation Paid with Cash and Money Orders - Detroit / Canada Loads | Transportation | | | | (27,000.00) | Defense Provided / Search Warrant Records |
| Paid with Cash and Money Orders - Container Loading Facilities | Other | (10,474.00) | | | (22,513.00) | Defense Provided / Search Warrant Records |
| Miscellaneous Vendors | Other | (2,872.42) | (340.00) | (2,395.00) | (38,226.33) | Accepted Defense's Representation |
| **TOTAL ADDITIONAL EXPENSES** | | $ (1,125,259.60) | $ (271,202.43) | $ (297,574.60) | $(1,459,393.61) | |
| **TOTAL ADDITIONAL EXPENSES** | $ | (3,153,430.24) | | | | |

*Ex. 9.*

The first column of Ex. 9 describes the nature of the expense, including the name
of shipping companies, e.g., Grimaldi and Sallaum.  The rightmost column,
"Source of Expense" shows whether the Government ascertained this expense
through records, e.g. search warrant documents or subpoena returns.  There are
also many expenses designated as "Accepted Defense's Representations."  These

47

are expenses that the Government, in good faith, accepted during restitution negotiations without any supporting documentation other than Defendant's representations.  Of course, the Government is not required to accept these representations and could still hold Defendant to his burden in providing these expenses, however, the Government is reasonable in acknowledging that Defendant likely had cash expenses that could not be accounted for via documentation.  In total, the Government accepted approximately $700,000 in additional expenses solely based on Defendant's representations.

Finally, based on these additional gross receipts and expenses, and after accounting for various other deductions, the Revenue Agent calculated a tax due and owing of $1,193,501:

| CORRECTED TAX LIABILITY - FORM 1040 YEARS 2017 - 2020 | | | | | |
|---|---|---|---|---|---|
| **ITEM** | **PARTICULARS** | **2017** | **2018** | **2019** | **2020** |
| 1 | Filing Status | MFJ | MFJ | MFJ | MFJ |
| 2 | Flow-Thru SOS - Unreported Gross Receipts | $    1,193,398.93 | $    1,384,911.47 | $    2,672,316.01 | $   1,580,943.84 |
| 3 | Less: Additional Expenses | (1,125,259.60) | (271,202.43) | (297,574.60) | (1,459,393.61) |
| 4 | Adjustment:  Loss Deducted on 2019 Tax Return | | (41,011.00) | 41,011.00 | |
| 5 | Add: Total Income Per Return | 226,881.00 | 164,933.00 | 290,709.00 | 420,140.00 |
| 6 | Corrected Total Income | 295,020.33 | 1,237,631.04 | 2,706,461.41 | 541,690.23 |
| | Less: | | | | |
| 7 | Adjusted Qualified Business Income Deduction | - | (141,611.00) | (176,658.00) | (26,696.00) |
| 8 | Self-Employed Health Insurance Deduction | (18,068.00) | | | |
| 9 | Corrected Adjusted Gross Income | 276,952.33 | 1,096,020.04 | 2,529,803.41 | 514,994.23 |
| | Less: | | | | |
| 10 | Standard Deduction/Itemized Deduction | (30,971.00) | (24,000.00) | (24,400.00) | (24,800.00) |
| 11 | Qualified Business Income Deduction Per Return | | | | |
| 12 | Exemption Amount | (24,300.00) | | | |
| 13 | Corrected Taxable Income | 221,681.33 | 1,072,020.04 | 2,505,403.41 | 490,194.23 |
| 14 | Tax on Correct Taxable Income | 48,955.27 | 351,200.48 | 849,965.19 | 109,890.43 |
| 15 | Less:  Prior Year AMT Credit | 6,370.00 | (2,132.00) | | |
| 16 | Less:   Tax Per Return | (32,715.00) | (15,424.00) | (46,761.00) | (77,358.00) |
| 17 | Add:  American Opportunity Credit | | 1,321.00 | | |
| 18 | Less: Child Tax Credit | | | | |
| 19 | Add:  Net Investment Income Tax | | | | 189.00 |
| 20 | **Corrected Tax Due and Owing** | $        22,610 | $       334,965 | $       803,204 | $        32,721 |
| 21 | **Additional Tax Due and Owing for 2017 - 2020** | | **$      1,193,501** | | |

*Ex. 10.*

## C.   Defendant Failed to Meet His Burden of Establishing Further Expenses That Would Reduce His Tax Liability

The Government's acceptance of approximately $700,000 in unsubstantiated expenses is not enough for Defendant.  Now he wants to lower his tax burden to nearly nothing based on no records.  The Court should not accept this backhanded attempt to attack the seriousness of his offense.  As stated, once the Government establishes income by a preponderance of the evidence, it is *Defendant's burden* to produce evidence of further unaccounted for expenses.  According to U.S.S.G. §

49

2T1.1 cmt. 3, "the court should account for any unclaimed . . . deduction . . . that is needed to ensure a reasonable estimate of the tax loss, but only to the extent . . . *the defendant* presents information to support the . . . deduction . . . sufficiently in advance of sentencing to provide an adequate opportunity to evaluate whether it has sufficient indicia of reliability to support its probable accuracy."  Despite nearly two years of meetings with Government, the defense has failed to provide evidence of the now-claimed expenses despite repeated requests to do so.

Defendant makes a myriad of excuses.  He says that he used a "reconciliation accounting" in his QuickBooks.  Def. August, 7, 2025 Submission at 11.  However, he is trying to confuse the Court.  The Government only counted as income entries that were specifically logged as "payments" from customers during the tax year that they were incurred, which were corroborated by employee and client interviews.  It therefore makes no difference what accounting method Defendant (who is not an accountant) claimed to have used because the Government **and his own tax preparers** used the cash method, which simply involved counting gross receipts and expenses when they were incurred.

He also stated that the fact that his business received many loans showed he was not making much money.  Interestingly, domestic bank records show that during some years, SOS received hundreds of thousands of dollars in "loans" from third parties: $90,500 in 2015; $60,000 in 2016; and $233,000 in 2017.  These

50

funds were deposited into SOS's bank account and referenced "loans" on the memo (subject) line of the deposit.  Most of this money came from businesses that do not appear to have shipped vehicles with SOS or Kain.  There is no evidence of any "payments" of interest or principal made on these loans.  The purpose of these "loans" is yet to be ascertained.

He also stated that many of payments that the Government logged as income were made directly to an ocean carrier by the customer, thereby also being a deductible "expense."  However, the Defendant provided these to his tax preparer.  According to the tax preparer, H.S., Ex. 1 at 2 ¶7, these expenses were already included in the tax returns for 2018 to 2020 because Kain provided them:

> 7. KAIN'S business tax returns are prepared using Drake software. Records utilized to prepare the tax returns mainly include the bank statements and summary sheets provided by KAIN. The summary sheets relate to payments made directly to the shipping companies and were provided in the years 2018, 2019 and 2020. ▓▓▓▓ explained the payments are a "wash" meaning the payments are recorded as income and expenses. ▓▓▓▓ stated KAIN started

Moreover, the Government accounted for further expenses of payments to shipping lines in 2017 as reflected in Ex. 9.  He has provided no evidence, other than his uncorroborated self-serving statements, that he is entitled to any further expenses for customer payments to shipping lines.

Finally, during negotiations, Defendant asserted for the first time in June 2025 that he was a victim of theft by various overseas agents or that he did not

receive payments from customers.  However, income was only counted when SOS received a designated customer payment and applied it against their account in QuickBooks.  Moreover, the government requested from him in evidence, Ex. 5, which would corroborate that he was the victim of theft by his overseas agents or that he had additional shipping expenses for which he did not already receive credit.  To date, the Government has not received that evidence.

If Defendant truly had millions of dollars in deductible expenses, it makes no sense why he would not have reported that to his tax return preparer to gain credit for those additional expenses.  Also, if the Government were to accept all of the expenses in defense's most recent submission as true, his business would have *lost* money during some years.  Indeed, the only explanation that makes sense with the evidence is that Defendant did not give his accountants access to SOS's internal QuickBooks because he knew it reflected much more income than what he wanted to report.  Since the search warrant, Defendant's reported income increased by more than 50%, which belies defense's assertion that his business was making no profit.

The Government disagrees with the Defendant's new post-hoc tax calculation, which was likely prepared by Kain himself or by employees at his direction and provided to the Government almost 1.5 years after its initial meeting with the defense.  Therefore, the Court should accept the Government's restitution

recommendation, as the defense as not born its burden of proving additional deductions.  U.S.S.G. § 2T1.1 cmt. 3.

## IV.    CONCLUSION

For the above reasons, the government recommends that the Court impose a sentence of 18 months in prison.  The Government also requests an Order of Restitution in the amount of $1,319,229.

Respectfully submitted,

KAREN E. KELLY
Acting Deputy
Assistant Attorney General
for Criminal Matters
U.S. Department of Justice
Tax Division

By:  *Richard J. Kelley*
RICHARD J. KELLEY
Trial Attorney
U.S. Department of Justice
Tax Division
(202) 616-5555
Richard.J.Kelley@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2025, a copy of the foregoing document

was filed via the CM/ECF system.  Notice of this filing will be sent to all parties

by operation of the Court's electronic filing system.

I also certify that on August 8, 2025, I will cauase a copy of this document

and related exhibits to be sent to the Court at the following address:

> Judge Matthew F. Leitman
> Theodore Levin U.S. Courthouse
> 231 W. Lafayette Blvd., Room 120
> Detroit, MI 48226

> By:   *Richard J. Kelley*
>        RICHARD J. KELLEY
>        Trial Attorney
>        U.S. Department of Justice
>        Tax Division

## EXHIBIT LIST

| 1  | Interview of H.S., Kain's tax return preparer |
|----|-----------------------------------------------|
| 2  | Interview of S.L. |
| 3  | Complaint, *United States v. Lebanese Canadian Bank SAL*, 11-cv-9186-PAE (S.D.N.Y. Dec. 15, 2011) |
| 4  | Pictures from Kain's residence taken during October 2021 search warrant |
| 5  | June 10, 2025, letter from the government to defense requesting corroboration of expenses |
| 6  | Settlement, *United States v. Lebanese Canadian Bank SAL*, 11-cv-9186-PAE, 3-4 (S.D.N.Y. May 16, 2012) |
| 7  | Interview of D.N., SOS employee |
| 8  | Summary exhibit of unreported gross receipts |
| 9  | Summary exhibit of additional expenses allowed |
| 10 | Summary exhibit of Kain's tax due and owing for 2017 to 2020 |